ESTATE OF LOUIS D. WHITEHEAD, DECEASED, W. H. WARDLAW, INDEPENDENT EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Whitehead v. Commissioner
Docket No. 2536-72.
United States Tax Court
T.C. Memo 1974-53; 1974 Tax Ct. Memo LEXIS 264; 33 T.C.M. (CCH) 253; T.C.M. (RIA) 74053; March 5, 1974, Filed. *264 Value of decedent's undivided one-half interest in 10,416-acre ranch in Val Verde County, Tex., determined. Elwood Cluck and R. James Curphy, for the petitioner. William T. Overton, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent determined a deficiency in the Federal estate tax due from the Estate of Louis D. Whitehead in the amount of $66,640.73. [1] The issues before the Court are the value at the time of his death of decedent's undivided one-half interest in a ranch in Texas known as the L. D. Whitehead ranch, and whether petitioner is entitled to a deduction for estate tax purposes for attorney's fees and trial expenses incurred in the administration of decedent's estate and in this proceeding. FINDINGS OF FACT The stipulated facts are so found. Petitioner, W. H. Wardlaw, independent executor of the estate of Louis D. Whitehead, was a resident of Del Rio, Tex., at the time the petition herein was filed. The Federal estate tax return for the estate was *265 filed with the district director of internal revenue in Austin, Tex. Louis D. Whitehead died on March 7, 1968, possessed of an undivided one-half interest in the surface and minerals in the L. D. Whitehead ranch (hereinafter "subject ranch"), which contained 10,416.2 acres of land located in the northeast part of Val Verde County, Tex. The remaining one-half undivided interest in subject ranch is owned in equal shares by decedent's son and daughter, which they acquired from decedent, presumably by gift. The son presently lives on the ranch; the daughter is married and lives in Dublin, Tex. Subject ranch is a part of the original Walter E. Whitehead ranch which consisted of approximately 80,000 acres of ranch land located in northeast Val Verde County and northwest Edwards County, Tex. The original ranch was partitioned among the seven children of Walter E. Whitehead in 1927; decedent was one of those children. Subject property lies 6 miles south of the Sutton County line, 1-1/2 miles west of the Edwards County line, and about 60 miles north of Del Rio, Tex. Subject property is bounded on the north by the W. B. Whitehead ranch and on the east by the W. R. Whitehead ranch, *266 both of which were a part of the original Walter E. Whitehead ranch and are owned by relatives of decedent. The highest and best use of the L. D. Whitehead ranch is raising livestock, primarily cattle, sheep, and goats. The terrain of the ranch consists mostly of low rolling hills with wide flats and draws. The hills and pasture areas tend to be rocky and subject to soil erosion. Valley sites comprise the remaining 5 percent of the ranch. The ranch is rather poorly watered. There are no creeks with water in them, and the soil itself has relatively low water-holding capacity. Of eight water well holes on the ranch, five are dry. Water is piped from the producing wells to other areas of the ranch, but there is no water within 2 miles of some areas of the ranch. The ranch is fenced into five large pastures, four traps, and the headquarters ranch. The line and cross fences, totaling about 20.9 miles, are predominantly 3- and 4-inch mesh, topped by 2 or 3 strands of barbed wire, and strung to cedar posts of varying sizes on 15- and 20-foot sets, and are in fair condition. Improvements on the subject ranch, typical of those on large working ranches in the area, include a main *267 dwelling, a secondary dwelling and cookhouse which are used by hunters during the hunting season, corrals, barns, labor houses, and a tool shed. The main dwelling, built in 1935 and remodeled in 1961, has three bedrooms, two baths, and totals about 1,900 square feet. The secondary dwelling, built in 1943, also has three bedrooms and two baths, and totals about 1,800 square feet. Subject ranch has been subject to invasion by bitterweed, a poisonous annual plant sometimes fatal to livestock, especially sheep. In recent years sheep raising has been deferred due to the bitterweed, and cattle have been added as a supplemental livestock. Ranch lands similar to subject ranch in this area have been leased for $1 per acre for grazing purposes. Subject ranch was leased for hunting in 1968 for $1,500. It was being used as a working ranch at the time of decedent's death. There had been little or no drilling for oil or gas in the vicinity of the Whitehead ranches prior to decedent's death. Subject ranch does not have frontage on a public road. It lies 4.8 miles west of U.S. Highway 277 which runs slightly east of a northerly direction from Del Rio to Sonora. Access to the ranch is *268 from a gate on Highway 277 on the W. R. Whitehead ranch, westerly across the W. R. Whitehead ranch, past the headquarters building, to a gate on the boundary of the two ranches. The headquarters buildings on subject ranch are about 7 miles west of Highway 277. Prior to 1950 ingress to and egress from subject ranch was by a private route, running generally north and then east through the original Whitehead ranch, called the Old Mail Road. This route bisected subject ranch in a north-south direction, continuing north to the headquarters of the W. B. Whitehead ranch and then north-east to intersect Highway 277, which was opened in 1941 or 1942. When Highway 277 was opened, W. R. Whitehead constructed a road from his headquarters to Highway 277. Several years later, in about 1944, W. R. Whitehead constructed a road from his headquarters property to the headquarters property of subject ranch to provide a road for his children to get to the Common School District Schoolhouse located at the headquarters of subject property. In about 1950 W. R. Whitehead gave decedent oral permission to cross his property on this road for ingress to and egress from subject ranch to Highway 277. Thereafter *269 the Old Mail Road was abandoned, and fences were extended across the gaps, and the only route used for ingress to and egress from subject property has been across the W. R. Whitehead property to Highway 277. However, neither decedent nor his heirs ever acquired a deeded easement or other legal right to cross the W. R. Whitehead ranch for ingress and egress; neither do they have a legal right to cross the W. B. Whitehead ranch along the Old Mail Road for purposes of ingress and egress. Petitioner reported the value of decedent's interest in the L. D. Whitehead ranch as $130,000 on the estate tax return. In his notice of deficiency respondent determined that the fair market value of decedent's interest in the ranch was $312,486. ULTIMATE FINDING OF FACT The fair market value of decedent's interest in the L. D. Whitehead ranch at the time of his death was $250,000. OPINION The first issue is the fair market value of decedent's undivided one-half interest in the surface and minerals in the L. D. Whitehead ranch. Our ultimate finding of fact reflects our conclusion on this issue. It was arrived at by doing our best to analyze the valuation reports and testimony of the two *270 expert witnesses, one offered by each of the parties, and deciding what adjustments in their approaches to the problem appeared reasonable in the light of all the evidence presented, including the evidence and testimony presented by petitioner's witnesses with respect to the depressing effect the lack of a legally enforceable access route to subject ranch and the fact that decedent owned an undivided interest in the property would have on its market value. Petitioner's evidence included the testimony of L. D. Whitehead, Jr., the testimony and report of James N. Castleberry, professor of law at St. Mary's University of San Antonio, Tex., with respect to legal rights of access to the ranch under Texas law, the testimony of William C. Church, Jr., an attorney, as to legal costs involved in partition suits, the testimony of Joseph H. Kurz, a consulting engineer and surveyor, with respect to the cost of surveying subject ranch for purposes of partition, a report and testimony by William H. Spice, a consulting geologist, as to the value of the mineral interests in subject ranch, testimony by E. Charles Lewis, a real estate broker, appraiser, and rancher, as to the effect on market value *271 of undivided interests in Texas ranch land, and finally, the appraisal report and testimony of Clifton Belcher, a qualified appraiser, as to the fair market value of decedent's interest in the ranch at the time of his death. Belcher fixed the value at $195,300, or $37.50 per acre, which is $65,300 higher than the value reported on the estate tax return. Respondent's evidence included testimony by Carvan Adkins, one of respondent's estate tax attorneys, as to the effect on land values of lack of legal ingress and egress, and the appraisal report and testimony of W. B. Garrett, Jr., a qualified appraiser, determining the fair market value of subject ranch, and decedent's interest therein. Garrett fixed the fair market value of the entire ranch at $583,000, or $55.97 per acre, and the value of decedent's interest therein at one-half thereof, or $291,500, which is about $21,000 less than the value determined by respondent. Both expert appraisers relied basically on the market data approach method of appraisal which involves determining the indicated value of subject property by taking actual sales prices of other properties comparable to subject property and were sold within a reasonable *272 time before or after decedent's death, and then adjusting those prices up or down for variables in subject property and the comparable properties. The variables considered by both experts included differences in time, location, size, and productivity. In addition, Belcher adjusted for the conditions of sale of the comparable properties if there was anything unusual about them, and for mineral interests. The amounts of these adjustments were determined by each appraiser based on his own experience, and varied to some degree. The net of these calculations was to reflect the indicated value per acre of subject property. Both appraisers also used the income method of appraising the ranch to check their market data values, but neither ultimately relied on the income approach in fixing final values. The differences in amounts assigned to the various adjustment factors in and of themselves resulted in some difference in the indicated value per acre of subject property between the two appraisers. Belcher made no adjustment for improvements on the theory that the improvements on subject property were typical of improvements on most working ranches and would not materially affect value, *273 while Garrett first deducted the value of improvements on comparable sales to arrive at indicated values of raw land, and then adjusted for differences in the value of improvements on subject property and the comparables. Garrett arrived at a higher indicated value per acre ($56) than did Belcher ($50), but this alone did not account for much of the difference in their final valuations. The principal reason for the rather large spread in final values arrived at by the two appraisers was that Belcher discounted the indicated value of the land and improvements on subject property $7.50 per acre because of lack of legally enforceable access and $5 per acre because decedent's interest was an undivided interest. Belcher used nine comparable sales in his analysis while Garrett used only five, three of which were also used by Belcher. The adjustments made by the appraisers to the sales prices of even these three identical sales to arrive at different indicated values for subject property are so elusory and dependent on individual judgment that we found it very difficult to determine which judgment to accept. On the whole, however, we felt that Garrett's choice of comparables and his *274 weighing of the various adjustment factors would be apt to produce a more accurate estimate of the value of subject property, and we started with his basic conclusions in reaching our conclusion, with some variations. However, we also accepted the uncontradicted evidence of the other witnesses that the lack of legally enforceable access to subject property and the fact that petitioner owned an undivided interest in the property would have a depressing effect on the market value of decedent's interest and concluded that some adjustment for these factors should be made. Our adjustments for these reasons, however, were not as great as Belcher's because we believe that inasmuch as decedent's son and daughter owned the only two outstanding interests in subject property at the time of decedent's death and the fact that access to the nearest public road from subject property would be over land owned by decedent's relatives, neither the cost of partitioning the property, if necessary, or selling it as a whole, nor the cost of acquiring a legally enforceable access to the public road, would be as great as it would be if total strangers were involved. A detailed discussion of our analysis *275 of the various factors that must be taken into consideration and the weight to be given to them in using the market data approach to estimate the indicated value of decedent's interest in subject property would be of little value to anyone. Suffice it to say that we have done what we thought was reasonable based on the evidence at hand to arrive at what in our judgment is an acceptable, though admittedly imprecise, estimate of the fair market value of decedent's interest in the property at the time of his death. The second issue for our consideration is whether petitioner is entitled to a deduction for legal fees and expenses incurred in the administration of the estate and in this proceeding. Petitioner deducted $10,000 for this purpose on the estate tax return which respondent disallowed for lack of substantiation. At the opening of the trial, it was understood that the estate would be entitled to a deduction for reasonable legal fees and expenses, and the record was left open for petitioner to submit proof of the amounts actually incurred. Petitioner failed to submit such proof to the Court [2], and we would be justified in disallowing the deduction for failure of proof. However, *276 there is no doubt that the estate is entitled to a deduction for such expenses if properly substantiated, so we will permit petitioner to submit proper substantiation of the amount that should be allowed, which can be taken into consideration in the Rule 155 computations to be submitted by the parties. Decision will be entered under Rule 155. Footnotes
1. Respondent would allow additional credit for State inheritance tax based on the increase in value of the estate if payment is substantiated. ↩
2. Petitioner did claim a deduction of $16,906.11 for these purposes in his reply brief and attached statements listing the various expenses incurred in making up this total. ↩